Opinion for the court filed by Circuit Judge WALLACH.
Opinion concurring-in-part and dissenting-in-part filed by Circuit Judge BRYSON.
WALLACH, Circuit Judge.
This case arises under the Contract Disputes Act, 41 U.S.C. §§ 7101-09. The Department of Energy (“DOE”) appeals and Rockwell International Company (“Rockwell”) cross-appeals from decisions of the Civilian Board of Contract Appeals (“Board”) that certain litigation defense costs are allowable under the parties’ management and operating contracts (“contracts”) and thus may be recovered by Rockwell.[1] We affirm-in-part and reverse-in-part the Board’s determinations.
BackgRound
A. The Contracts
Beginning in 1975, DOE entered into a series of contracts with Rockwell for the management, operation, and maintenance of the government-owned Rocky Flats Nuclear Weapons Plant in Colorado (“Rocky Flats”). Abraham v. Rockwell Int’l Corp., 326 F.3d 1242, 1244 (Fed.Cir.2003).[2] Private industrial firms have managed and operated the facility since its construction in the early 1950s. Id. at 1245. The contracts governing the management and operation of the facility require the Government, not the private firms, to assume almost all operational and financial risks because of the inherent danger in manufacturing nuclear weapon components. Id. Rockwell’s contracts contain cost-reimbursement provisions that enable Rockwell to recover all allowable costs. Id. The *981 dispute here centers on whether certain costs incurred by Rockwell in defending itself in litigation are recoverable.
The two contracts currently at issue are the 1986 contract effective from January 1, 1986 until December 31, 1988 and the 1989 contract effective from January 1, 1989 until December 31,1989.[3] They were both cost-plus-award-fee contracts. 48 C.F.R. § 16.405-2.[4] Both contracts provided that “allowable cost shall not include the cost of any item described as unallowable....”
Effective January 1, 1987, the parties adopted Modification M097, which added clause (e)(32) to the 1986 contract (“clause (e)(32)”), and provided as follows:
(e) Items of Unallowable Costs. The following items of costs are unallowable under this contract to the extent indicated:
(32) Costs incurred in defense of any civil or criminal fraud proceeding or similar proceeding (including filing of any false certification) brought by the Government where the Contractor, its agents or employees, is found liable or has pleaded nolo contendere to a charge of fraud or similar proceeding (including filing of a false certification).
(emphasis added).[5]
Effective January 1, 1989, the parties adopted Modification M124, which provides:
(d) Items of Allowable Cost. Subject to the other provisions of this clause, the following items of cost of work done under this contract shall be allowable to the extent indicated:
(16) All cost incurred by the Contractor with respect to any and all liabilities, claims, demands, damage costs, or penalties (such as civil sanctions including fines), arising out of, or related to environmental, safety and health activities, including costs incurred with respect to investigation, removal, remedial action, ground and surface water or other clean-up of hazardous, toxic or contaminated material(s), except for those costs that result from conduct identified in subparagraph (e)(17)(ii) of the clause entitled, “Allowable Costs, Base Fee and Award Fee.”
*982 (“Environmental Costs Clause”) (emphasis added). Subparagraph (e)(17)(ii) expressly excludes costs that “result from willful misconduct or lack of good faith on the part of any of the Contractor’s managerial personnel.”
B. The Stone Suit
On June 25, 1987, Mr. James Stone[6] informed the Federal Bureau of Investigations of alleged environmental crimes that occurred at Rocky Flats; the Department of Justice began investigating in 1988.[7]
On July 5, 1989, Mr. Stone, instituted a qui tarn, action alleging violations of the FCA against Rockwell in the United States District Court for the District of Colorado. However, on December 20, 1996, the Government and Mr. Stone (collectively, “plaintiffs”) filed a joint amended complaint alleging violations of the FCA (Count 1), common law fraud (Count 2), breach of contract (Count 3), payment by mistake (Count 4), and unjust enrichment (Count 5); Mr. Stone additionally asserted other FCA violations (Count 6). Plaintiffs contended that during certain time periods, Rockwell violated the FCA by using false or fraudulent statements to obtain its award fees and operating costs. Following a jury trial, the district court entered judgment against Rockwell solely for Count 1 for certain time periods. The judgment provided for plaintiffs’ recovery of $4,172,327.40 (three times the jury award), and the Government’s recovery of a civil penalty of $15,000.00. The Tenth Circuit affirmed these awards. United States v. Rockwell Int’l Corp., 282 F.3d 787 (10th Cir.2002).
On April 4, 2006, Rockwell filed a petition for a writ of certiorari. The only issue before the Supreme Court was “whether respondent Mr. Stone was an original source” for purposes of standing to bring suit. Rockwell Int’l Corp. v. United States, 549 U.S. 457, 460, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007). An “original source” is “an individual who [1] has direct and independent knowledge of the information on which the allegations are based and [2] has voluntarily provided the information to the Government before filing an action under this section which is based on the information.” 31 U.S.C. § 3730(e)(4)(B). This question pertained only to FCA violations involving pond-crete.[8] On March 27, 2007, the Court held that Mr. Stone was not an “original source” with respect to FCA violations involving pondcrete. Rockwell, 549 U.S. at 479, 127 S.Ct. 1397. Therefore, the Court found that the district court lacked jurisdiction to enter judgment in favor of Mr. Stone, and reversed the Tenth Circuit’s holding to the contrary. Id.[9]
*983 On June 18, 2007, the Tenth Circuit affirmed the judgment in favor of the Government for the reasons articulated in its prior opinion, United States v. Rockwell Int’l Corp., 282 F.3d 787 (10th Cir.2002), but remanded with directions to vacate the portion of the judgment entered in favor of Mr. Stone and dismiss his portion of the case. United States v. Rockwell Int’l Corp., 492 F.3d 1157 (10th Cir.2007).
C. Stone Defense Costs
At the beginning of the Stone suit, when Rockwell was served with Mr. Stone’s Complaint on November 13, 1995, Rockwell submitted to DOE vouchers for payment of related defense costs (“Stone defense costs”). On April 22, 1993, DOE stated it would provisionally reimburse Rockwell and “reserve[ ] the right to evaluate the final outcome of the case and seek reimbursement from Rockwell for any amount paid....” A160. After conditionally reimbursing Rockwell $4,060,669.03 in Stone defense costs, DOE notified Rockwell on December 6, 1995, that those costs were unallowable pursuant to the DOE and Rockwell contracts.
In May 2005, Rockwell requested a contracting officer’s final decision, seeking $11,344,081.14 as reimbursement for the Stone defense costs incurred from November 14, 1995, to December 31, 2004. On September 30, 2005, the contracting officer issued a final decision denying Rockwell’s claim. Additionally, the contracting officer rendered a final decision granting the Government’s claim against Rockwell for recovery of $4,060,669.03, the amount that DOE provisionally advanced as reimbursement for Rockwell’s Stone defense costs, plus interest. Rockwell appealed this final decision along with other related later decisions to the Board which were consolidated into various appeals before the Board.
D. Board Decisions
From July 9, 2007 to March 8, 2011, six Board decisions were issued which currently are being challenged by one or both parties.[10] The Board considered whether Rockwell’s costs incurred defending Stone were unallowable under clause (e)(32) and held that such costs could be apportioned on a claim-by-claim basis and determined that: (1) costs relating solely to claims where the Government was successful are unallowable; (2) costs relating solely to claims where Rockwell was successful are allowable under clause (e)(32); and (3) costs relating to common costs, i.e., costs incurred defending against both claims where Rockwell was successful and was found liable, are unallowable.
DOE filed a timely appeal. Rockwell cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).[11]
*984 Discussion
The Board’s factual determinations will be set aside if arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, or not supported by substantial evidence. 41 U.S.C. § 7107(b)(2). The Board’s determinations of questions of law, including interpretation of contracts, statutes and regulations, are subject to de novo review. Lear Siegler Servs. v. Rumsfeld, 457 F.3d 1262, 1265-66 (Fed. Cir.2006).
We first address the term “proceeding” in clause (e)(32) and this clause’s interaction with the Environmental Costs Clause within the contract. Next, we turn to the Stone defense costs incurred by Rockwell after Mr. Stone filed the now reversed qui tarn action and before the Government intervened. Finally, we turn to the “common costs” incurred by Rockwell in defending against claims during the period of litigation after the Government intervened where Rockwell was successful on some claims but was found liable on others.
A. “Proceeding” in clause (e)(32) and the Environmental Costs Clause
The Stone jury found Rockwell liable on three FCA violations against the Government. Whether Rockwell’s costs of defending this lawsuit are allowable under its contracts with DOE rests in large part on the proper interpretation of two provisions found in those contracts: clause (e)(32) and the Environmental Costs Clause.
We find that a plain reading of clause (e)(32) suggests that the Board’s more limited reading of “proceeding” found within this provision is correct. Read in its entirety, the clause disallows
[cjosts incurred in defense of any civil or criminal fraud proceeding or similar proceeding (including filing of any false certification) brought by the Government where the Contractor, its agents or employees, is found liable or has pleaded nolo contendere to a charge of fraud or similar proceeding (including filing of a false certification).
DOE contends that in “Clause (e)(32), the choice of the word ‘charge,’ which Rockwell agrees means a claim, stands in contrast to the choice of the word ‘proceeding.’ ” Response and Reply Br. of the Secretary of Energy at 8 (internal citation omitted). We disagree. In this context, “charge of fraud” is immediately followed by “or similar proceeding,” illustrative that a “charge of fraud” is a type of “proceeding.” This indicates that a “proceeding” means something less than an entire litigation action as DOE contends. Additionally, “proceeding” is twice followed by “including filing of any false certification,” which again is a claim, not an entire case.[12] However, as *985 pointed out by the DOE, “proceeding” is also joined to the words “civil” and “criminal,” two types of actions, not two types of claims.[13]
When construing a contract containing conflicting terms, general rules of interpretation apply. It is a general rule of contract interpretation that terms should not be interpreted so as to render them ineffective or superfluous. Lockheed Martin IR Imaging Sys. v. West, 108 F.3d 319, 322 (Fed.Cir.1997); see also Restatement (Second) of Contracts § 203(a) (“an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect”). The narrow reading of clause (e)(32) adopted by the Board is necessary to avoid conflict with other provisions of the contract, particularly the Environmental Costs Clause, which clearly provide for reimbursement of costs incurred in defending claims related to environmental, safety, and health activities except in cases of willful misconduct or lack of good faith.
The Environmental Costs Clause states that “all cost incurred ... with respect to any and all liabilities, claims, demands, damage costs, or penalties (including fines), arising out of, or related to environmental, safety and health activities” are allowable for reimbursement. As we have previously stated concerning this clause:
*986 The clause refers to “all costs ... with respect to any and all ... penalties (such as civil sanctions including fines), arising out of, or related to environmental ... activities.” Further, it expressly refers to the costs incurred “with respect to investigation.” Tellingly, the clause specifically excludes “costs that result from conduct identified in subpar-agraph (e)(17)(ii).” That subparagraph refers to costs that “result from willful misconduct or lack of good faith on the part of any of the Contractor’s managerial personnel.” The limited nature of this exclusion suggests a broad scope of coverage where, as here, there is no claim of willful misconduct or lack of good faith by managerial personnel.
Abraham, 326 F.3d at 1252-1253.
In Abraham we found that the Environmental Costs Clause prevailed over the Contesting Actions Clause[14] in the context of allegations against Rockwell that had not ripened to criminal charges. Id. at 1254. Abraham is informative in this context. As in this case, we were confronted with a conflict between the Environmental Costs Clause and a clause under “Items of Unallowable Costs.” In Abraham, we rejected DOE’s argument that the unallowa-ble costs provision at issue excluded costs allowable under the Environmental Costs Clause because instead of “partially limit[ing] the coverage of the [Environmental Costs Clause],” the Government’s reading “effectively ... rewr[o]te the clause” to render it “entirely inapplicable to all proceedings brought under the federal environmental laws, an area that the clause was explicitly drafted to cover.” 326 F.3d at 1253.
Similarly here, DOE’s interpretation would render the Environmental Costs Clause completely inapplicable to an entire action involving liabilities and claims related to environmental, safety and health activities whenever, as part of that entire action, liability was found for fraud or claims similar to fraud. This is an area the Environmental Costs Clause was explicitly drafted to cover. See A1054-55 (the Environmental Costs Clause covers “any and all liabilities [and] claims ... arising out of, or related to environmental, safety and health activities”). By contrast, there is nothing in the text of clause (e)(32) or elsewhere in the record that indicates clause (e)(32) was explicitly drafted to cover claims related to environmental, safety and health activities or any claims that are not “fraud ... or similar proceeding^]” and where Rockwell was not “found liable.” Indeed, the “proceedings” as articulated in this clause are limited to “fraud” proceedings and therefore renders themselves distinct from other types of proceedings, e.g., those related to environmental claims.
DOE argues at length that there are adequate applicable regulations, statutes, legislative history, and case law to indicate that “proceeding” means “action.” However, these indications do not overcome the expansive language of the Environmental Costs Clause. DOE’s interpretation overlooks the explicitly broad scope of the Environmental Costs Clause and the explicitly narrow limitation of clause (e)(32) to “fraud ... or similar proceeding^]” where the contractor is “found liable.” We therefore affirm the Board’s interpretation of “proceeding.”
*987 B. Stone Defense Costs and the Supreme Court
DOE contends that the Board “erred in applying its ‘restrictive’ definition of ‘proceeding’ to Rockwell’s claim for Stone defense costs incurred from the time the suit was filed to the date the Government moved for leave to intervene, and determining such costs ‘could be considered to have been expended in a different and separate suit or proceeding.’ ” Opening Br. of the Secretary of Energy at 51. DOE argues, notwithstanding the findings of the Supreme Court, “[t]here was only one Stone suit.” Id.
Rockwell contends that it does not matter how many suits there were in Stone, only that “as the Board correctly concluded, allowability turns on whether the Government Claim involves costs of defending a ‘fraud ... or similar proceeding’ where Rockwell was ‘found hable.’ ” Br. of Rockwell at 51. Rockwell also contends that the Board was correct in determining that the issues before it were identical and actually litigated in the Supreme Court action, and thus collateral estoppel applied.
Given our interpretation of the applicable contract provisions above, Rockwell is correct that allowability of costs turns on whether the claim involves costs of defending a “fraud ... or similar proceeding” where Rockwell was “found liable.” We find that because the Supreme Court determined that Mr. Stone was not an original source and therefore the district court was unable to properly exercise jurisdiction over his part of the litigation, it follows that Rockwell could not be liable for that part of the litigation. As pointed out by the Board, “the claims where Rockwell was found liable were not even asserted until the amended complaint was filed.” DOE’s argument that the “gravamen of the initial and amended complaints was the same, ie., Rockwell concealed from the Government environmental problems involving unstable pondcrete in order to get claims paid or approved,” may be true, Response and Reply Br. of the Secretary of Energy at 33; however, the contracts require Rockwell be found liable before the costs are disallowed — Rockwell cannot be held hable for costs incurred defending against claims brought by a plaintiff who has no standing. Accordingly, costs incurred prior to the Government’s intervention are allowable reimbursements.
C. Common Defense Costs
With regards to the claims or issues Rockwell both won and lost after the Government’s intervention, ie., the “common costs,” Rockwell argues that “[wjhile the Board correctly concluded that clause (e)(32) does not bar all Stone defense costs, it erred in limiting Rockwell’s recovery.” Br. of Rockwell at 53. Rockwell argues that “the Board had discretion to award Rockwell all its costs.... But the Board found that it lacked the power to do so, or even apportion costs, despite Rockwell’s limited liability in Stone.” Id. at 66.
We agree with Rockwell that the Board has the authority to apportion costs based on Rockwell’s liability in Stone. In Abraham, we noted that
Normally the costs of a database used for more than one purpose should have been apportioned in some manner to reflect both the allowable and unallowa-ble uses. Here, however, the government did not argue for the apportionment of those costs, but rather followed an all or nothing approach, arguing only that these costs be found unallowable in their entirety for the same reasons that it urged that the corporate defense costs were unallowable. Having found that the corporate defense costs are allowable, the database costs are similarly allowable because the government has *988 waived its right to argue for apportionment.
Abraham, 326 F.3d at 1255. This language clearly contemplates the ability of the Board, under these contract terms, to apportion costs in certain cases. Additionally, this ability is consistent with our limited construction of the term “proceeding” above. To disallow such costs in every situation where liability for fraud or similar proceeding is found is too broad of a contention, encouraging potential piecemeal litigation, judicial inefficiency, and unfair results.
However, we find that the Stone litigation involved a “common core of facts” and was “based on related legal theories.” See Hensley v. Eckerhart, 461 U.S. 424, 485, 108 S.Ct. 1933, 76 L.Ed.2d 40 (1983). As stated by other circuits, there are circumstances “[w]here several claims arise out of a common factual core or are based on related legal theories, separating out the legal services rendered with respect to these overlapping claims would be an exercise in futility.” Munson v. Milwaukee Bd. of School Directors, 969 F.2d 266, 272 (7th Cir.1992); see also Garrity v. Sununu, 752 F.2d 727, 735 (1st Cir.1984). Here, the Board expressly recognized that the claims at issue were interrelated and based on the same core facts: “Counts 1 through 5 all involved issues relating to pondcrete and sal1> crete.... Those core facts all supported to some degree alleged claims for FCA violations, common law fraud, breach of contract, payment by mistake, and unjust enrichment.” A34. In this case, we find that because there is a common core of facts all relating to the fraud for which Rockwell was found liable, apportionment is inappropriate in this case. See A491-94, Department of Justice’s Amended Complaint.
Conclusion
Because the Board correctly determined that costs relating to claims sounding in fraud where the Government was successful are unallowable and that costs relating to claims where Rockwell was successful are allowable under clause (e)(32), we AFFIRM IN PART. Because we find that the Board had the authority to apportion costs, we REVERSE IN PART. However, apportionment is inappropriate in this case; therefore, it is unnecessary to remand.
AFFIRMED-IN-PART, REVERSED-IN-PART
Costs
No costs.

. The Boeing Company ("Boeing") is the suc-cessorin-interest of Rockwell. All references herein to Rockwell and Boeing are interchangeable.

. Previously, in Abraham, we addressed a dispute between the same parties regarding the allowability of costs incurred in defense of allegations that never ripened into criminal charges. See infra n. 7.

. The pertinent provisions in the 1986 and 1989 contracts are identical except for the Fines and Penalties Clause, and the differences between these two clauses are minor and do not impact our analysis.

. 48 C.F.R. § 16.405-2 provides:
A cost-plus-award-fee contract is a cos-treimbursement contract that provides for a fee consisting of (1) a base amount fixed at inception of the contract, if applicable and at the discretion of the contracting officer, and (2) an award amount that the contractor may earn in whole or in part during performance and that is sufficient to provide motivation for excellence in the areas of cost, schedule, and technical performance. See 16.401(e) for the requirements relative to utilizing this contract type.

. Clause (e)(32) is virtually identical to provisions of the Department of Defense Authorization Act, 1986 ("the 1985 Act”), Pub.L. No. 99-145, 99 Stat. 583,683,774-75 (November 8, 1985). The 1985 Act bars a contractor’s recovery of 10 types of costs, and states:
(e)(1) The following costs are not allowable under a covered contract:
(C) Costs incurred in defense of any civil or criminal fraud proceeding or similar proceeding (including filing of any false certification) brought by the United States where the contractor is found liable or has pleaded nolo contendere to a charge of fraud or similar proceeding (including filing of a false certification).
Id. The Board turned to this act and its legislative history in interpreting the contract provisions at issue. See, e.g., Boeing Co. v. Dep’t of Energy, CBCA 337, 338, 339, 978, 11-1 BCA ¶ 34,634 (December 14, 2010).

. From November 1980 through March 1986, Mr. Stone worked as an engineer at the Rocky Flats. Rockwell Int’l Corp. v. United States, 549 U.S. 457, 460, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007).

. In response to these investigations, Rockwell retained legal counsel both for itself and for individual employees to defend against the allegations. Some of the allegations never ripened into criminal charges. In a previous case before this court, we affirmed the Board's decision that costs incurred defending against allegations that never ripened into criminal charges were allowable; we held that "the legal fees in defense against Uncharged Conduct are recoverable because they are within the scope of allowable costs under the Environmental Costs Clause.” Abraham, 326 F.3d at 1254.

. Pondcrete is a mixture of sludge from solar ponds and cement.

. With regards to the Government’s actions in the case, specifically its intervening and filing of a joint amended complaint with Stone, Justice Scalia stated for the majority;
Does this conclusion cast into doubt the courts' jurisdiction with respect to the Government as well?.... Not even petitioners have suggested the bizarre result that the Government’s judgment must be set aside. It is readily enough avoided, as common sense suggests it must be, by holding that *983 an action originally brought by a private person, which the Attorney General has joined, becomes an action brought by the Attorney General once the private person has been determined to lack the jurisdictional prerequisites for suit.
Rockwell, 549 U.S. at 478, 127 S.Ct. 1397.

. See Boeing Co. v. Dep’t of Energy, CBCA 337, 338, 339, 2007 WL 5035796 (July 9, 2007); Boeing Co. v. Dep’t of Energy, CBCA 978, 08-1 BCA ¶ 33,822 (March 21, 2008); Boeing Co. v. Dep’t of Energy, CBCA 978, 08-2 BCA ¶ 33,893 (June 23, 2008); Boeing Co. v. Dep’t of Energy, CBCA 337, 338, 339, 978, 09-1 BCA ¶ 34,026 (December 10, 2008); Boeing Co. v. Dep’t of Energy, CBCA 337, 338, 339, 978, 11-1 BCA ¶ 34,634 (December 14, 2010); Boeing Co. v. Dep’t of Energy, CBCA 337, 338, 339, 978, 11-1 BCA ¶ 34,703 (March 8, 2011).

. Previously, the parties appealed to this court; however, we held that because the Board had yet to determine whether clause (e)(32) allows Rockwell to recover common costs, the Board’s decision was not final, and we therefore lacked jurisdiction. Chu v. Boeing Co., 375 Fed.Appx. 10, 12 (Fed.Cir.2010).

. We will not adopt the interpretation of the word "proceeding” from our prior case law that dealt with a different statute and a different contract. In Rumsfeld v. General Dynamics Corporation, 365 F.3d 1380 (Fed.Cir. 2004), we held that, in the context of section 2324(k) of the Major Fraud Act (10 U.S.C. § 2324), the Armed Services Board of Contract Appeals incorrectly “required the apportionment of legal costs for defending against different claims with different outcomes within a single proceeding.” Id. at 1381. In General Dynamics, which involved awarding government subcontracts in exchange for bribes and kickbacks, we determined that "proceeding” "must be given a broad meaning, such that it includes all claims or causes of action within a particular case, action or proceeding.” Id. at 1386. We found the text, other sections of the Major Fraud Act, and the legislative history to support this interpretation. Id. General Dynamics presented a situation unlike the one currently before us. In General Dynamics, we did not define "proceedings” for all future purposes: unlike here, the relevant text, context, and legislative history supported a broad reading of the term "proceeding,” as it was used in 1988 in section 2324(k) of the Major Frauds Act. Additionally, as we stated clearly in General Dynamics, the "holding of this case is limited to its facts” and specifically to situations "where there is a disposition of proceeding by con *985 sent or compromise,” a situation not currently before us. Id. at 1385 n. 2, 1387.

. The dissent finds further interpretation beyond the plain meaning warranted and turns to the 1985 Act, its legislative history, background, and regulatory interpretation in order to determine the proper definition of "proceeding.” However, reading the contract as a whole, it is unnecessary to consider extrinsic evidence to interpret the term at issue. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed.Cir.2003) (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed.Cir.1996)) ("Where, as here, the provisions of the Agreement are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them.... The Agreement must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts.”).
Even if the proper definition of "proceeding” is ambiguous, it is "a fundamental precept of common law that the intention of the parties to a contract control its interpretation." Beta Sys. Inc. v. United States, 838 F.2d 1179, 1185 (Fed.Cir.1988) (citing Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551 (Ct.Cl.1971)); see also Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed.Cir.1987) (“In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties."). In this case, as we recognized in Abraham, the contracts were negotiated with an express DOE intent to assume almost all liability: "Because of the inherent danger in manufacturing nuclear weapons components, the [Plant] contracts required the government to assume virtually all operational and financial risks in performing the contracts.” 326 F.3d at 1245. See, e.g., Rockwell Int’l Corp., EBCA Nos. C-9509187, C-9509220, C-9509221 (October 31, 2001) (“Typically, at least at the times relevant here, M & O contracts allocated virtually all operational and financial risks to the United States Government. Limiting contractor risk has always been a prerequisite to engaging suitable companies as contractors. DOE officials recently recognized that ‘[i]f the Department did not fully indemnify its contractors, ... the risks to the contractors would be so great, that the Department would be unable to find qualified contractors willing to run the Department's facilities.’ ”); see also A984, 1000, 1033-41. This intent counsels for a more limited meaning of "proceeding,” consistent with our above analysis.
While it is true that congressional intent is also relevant to ascertaining the contracting parties' intent when statutory provisions are incorporated into a contract, Roedler v. Dep’t of Energy, 255 F.3d 1347, 1352 (Fed.Cir.2001), the intent behind the 1985 Act of Congress cannot outweigh the plain meaning of the provision, which is evident when the provision is read in context. Nor does the legislative history outweigh other persuasive evidence of the parties’ contractual intent.

. The Contesting Actions Clause makes unal-lowable the following:
Legal, accounting, and consulting services and related costs incurred in connection with the preparation and issuance of stock rights, organization or reorganization, prosecution or defense of antitrust suits, prosecution of claims against the United States, contesting actions of [sic] proposed actions of the United States, and prosecution or defense of patent infringement litigation.
Abraham, 326 F.3d at 1248 n. 3.